[No. B122407. Second Dist., Div. Four. Aug. 19, 1998.]

ROSEMARY WILDER, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION
AUTHORITY, Real Party in Interest.

COUNSEL

Leslie T. Zador for Petitioner.

No appearance for Respondent.

David Kyle for Real Party in Interest.

OPINION

COOPER, J.*—

FACTUAL AND PROCEDURAL BACKGROUND

According to the petition, on November 13, 1997, petitioner Rosemary Wilder was struck by a Blue Line train at the pedestrian grade crossing adjacent to the Willow Station near 27th Street and Long Beach Boulevard in the City of Long Beach. The Blue Line is operated by respondent Los Angeles County Metropolitan Transportation Authority (MTA). Petitioner did not immediately file suit. Instead, through her attorney,[1] she made two requests for public documents under the California Public Records Act (Gov. Code, § 6250 et seq.) (CPRA).[2] According to petitioner, the requests were made to assist her in formulating a thorough government claim.

*First Request*

By letter dated January 30, 1998, petitioner requested the following documents. "1. Civil engineering plan of the intersection of the grade crossing of the Blue Line with Long Beach Boulevard and 27th Street in Long Beach . . . ; [¶] 2. The traffic signal diagram and phase chart which pertained to the intersection of 27th Street and Long Beach Boulevard on November 13, 1997 . . . ; [¶] 3. The traffic signal diagram and phase chart which pertained to the intersection of Willow Street and Long Beach Boulevard on November 13, 1997 . . . ; [¶] 4. The wiring diagrams, including pre-emption controls, which pertained to the intersection of 27th Street and Long Beach Boulevard on November 13, 1997; [¶] 5. The wiring diagrams, including pre-emption controls, which pertained to the intersection of Willow Street and Long Beach Boulevard on Nov[ember] 13, 1997; [¶] 6. The

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]Petitioner retained Leslie T. Zador of the Law Office of Leslie T. Zador as her counsel.

[2]Unless otherwise specified, all statutory references are to the Government Code.

rules in effect on November 13, 1997, for trolley/train operators related to trolley/train operation and procedures to be followed in the event of a serious accident; [¶] *7. The MTA Accident Report having to do with the accident of November 13, 1997, which occurred at approximately 6:10 p.m. at or near the Willow Station . . . ;* [¶] 8. Traffic and train/trolley signal maintenance reports inclusive of the period beginning August 1, 1997, and ending November 13, 1997, for location beginning with Willow Street at Long Beach Boulevard to the south and continuing to the northernmost part of the Willow Station (#16); [¶] *9. Reports of any and all train/trolley vs. pedestrian accidents that had occurred at any time prior to November 13, 1997, within a one-mile radius of the Willow Station (#16);* [¶] *10. Reports of any and all train/trolley vs. pedestrian accidents that have occurred within the time-frame beginning January 1, 1993, and ending November 13, 1997, on the Blue Line;* [¶] *11. The training record of Edward Joseph Bartley;* [¶] 12. The training manual that was in use on 11/13/97 for trolley/train operators; [¶] *13. The MTA service record of Edward Joseph Bartley;* and [¶] 14. A copy of your guidelines pursuant to *California Government Code* §6253." (Italics added.)

*Second Request*

By letter dated February 24, 1998, petitioner further requested: "1. All 'as built' engineering plans of the intersection of the grade crossing of the Blue Line with Long Beach Boulevard and 27th Street in Long Beach . . . ; [¶] 2. The Operator's Manual that was in use on 11/13/97 for trolley/train operators; [¶] 3. The Supervisor's Manual that was in use on 11/13/97 for supervisors of trolley/train operators; [¶] *4. Any and all supplemental reports or addenda to the MTA Accident Report having to do with the accident of November 13, 1997, which occurred at approximately 6:10 p.m. at or near the Willow Station . . . ;* [¶] *5. Any and all photographs related in any way to the accident of November 13, 1997, which occurred at approximately 6:10 p.m. at or near the Willow Station (#16) in which Rosemary Wilder, a pedestrian, was injured;* [¶] *6. Any and all tape recordings that are in any way related to the accident of November 13, 1997, which occurred at approximately 6:10 p.m. at or near the Willow Station (#16) in which Rosemary Wilder, a pedestrian, was injured;* [¶] *7. Reports of any all train/trolley vs. pedestrian accidents that have occurred on the Blue Line within the time-frame beginning with the inception of the Blue Line and ending January 1, 1993;* [¶] *8. The trolley driving records of Edward Joseph Bartley;* [¶] *9. The results of any drug testing administered to Edward Joseph Bartley following the accident of November 13, 1997;* [¶] 10. Post-construction 'as built' engineering plans for any changes to any of the stations in the Blue Line; and [¶] 11. Any and all documentation indicating, with respect to any post-construction changes to any of the stations in the Blue Line, what changes were done, at which stations, who did them, and when they were done." (Italics added.)

By letter dated April 7, 1998, MTA responded that items Nos. 7, 9, and 10 from the first request and items Nos. 4 through 7 from the second request were exempt from disclosure "because the documents were prepared in anticipation of litigation." MTA further contended that items Nos. 11 and 13 from the first request and items Nos. 8 and 9 from the second request were exempt "because the documents are personnel-related and their disclosure would constitute an unwarranted invasion of personal privacy."

Petitioner filed a petition for writ of mandate in the trial court, seeking an order to disclose the records. MTA demurred on the grounds that (1) ". . . Petitioner has a plain, speedy and adequate remedy at law by filing its claim against Respondent in the manner prescribed by law" and (2) "Petitioner is seeking to circumvent the discovery process, which is applicable to her and available when Petitioner files her claim, by seeking discovery of information that Respondent asserts as privileged and was prepared in anticipation of litigation or the filing of a claim by Petitioner." MTA also filed an answer.

The matter was dismissed by the trial court. The order dismissing the petition stated: "There is an adequate remedy at law, . . . e.g. formal discovery in the anticipated civil . . . lawsuit to be filed by petitioner against respondent."

DISCUSSION

Section 6250 expresses the legislative policy behind the CPRA: "[A]ccess to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state." The term "Public records" was defined broadly by the statute to include "any writing containing information relating to the conduct of the public's business prepared, owned, used, or retained by any state or local agency regardless of physical form or characteristics." (§ 6252, subd. (d).) Under section 6253, subdivision (a), "Public records" are to be "open to inspection at all times during the office hours of the state or local agency and every person has a right to inspect any public record, except as hereafter provided."

Section 6258 provides: "Any person may institute proceedings for injunctive or declarative relief or writ of mandate in any court of competent jurisdiction to enforce his or her right to inspect or to receive a copy of any public record or class of public records under this chapter. The times for responsive pleadings and for hearings in these proceedings shall be set by the judge of the court with the object of securing a decision as to these matters at the earliest possible time." Under section 6259, subdivision (a),

"Whenever it is made to appear by verified petition to the superior court of the county where the records or some part thereof are situated that certain public records are being improperly withheld from a member of the public, the court shall order the officer or person charged with withholding the records to disclose the public record or show cause why he or she should not do so."

Review of grant or denial of a section 6258 proceeding is also by way of writ: "In an action filed on or after January 1, 1991, an order of the court, either directing disclosure by a public official or supporting the decision of the public official refusing disclosure, is not a final judgment or order within the meaning of Section 904.1 of the Code of Civil Procedure from which an appeal may be taken, but shall be immediately reviewable by petition to the appellate court for the issuance of an extraordinary writ." (§ 6259, subd. (c).)

The trial court concluded that this statutory procedure was subject to the rule applicable to ordinary mandate (Code Civ. Proc., § 1085); that mandate is not available where there is a plain, speedy, and adequate remedy at law. (See Code Civ. Proc., § 1086.) This rule has been applied to administrative mandate (Code Civ. Proc., § 1094.5) as well. (See, e.g., *Nast v. State Bd. of Equalization* (1996) 46 Cal.App.4th 343, 347 [53 Cal.Rptr.2d 592]; *Mystery Mesa Mission Christian Church, Inc.* v. *Assessment Appeals Bd.* (1976) 63 Cal.App.3d 37, 39 [133 Cal.Rptr. 565].) Because petitioner could theoretically obtain the same or similar documents from MTA by pursuing a legal claim, the court refused to enforce her rights under the CPRA.

We believe the trial court's analysis is incorrect. The statutory provision for enforcing the CPRA is not the equivalent of ordinary mandamus. Under the CPRA, the Legislature created an avenue whereby "every person in this state" may obtain ready access to "public records." Where documents are withheld "[a]ny person may institute proceedings for injunctive *or* declarative relief *or* writ of mandate . . . ." (§ 6258, italics added.) The express "object" of the enforcement provision is to ensure that review of an agency decision to withhold documents from a "member of the public" be secured "at the earliest possible time."

Petitioner did not cease to be a "member of the public" when she was struck by the Blue Line. The statute, which we are bound to interpret in accordance with its plain language unless doing so would lead to absurd results, requires that public records be made available to "every person in this state," without exception. It further allows "any person" aggrieved to obtain relief either through legal proceedings (for "injunctive or declarative

relief") or through "writ of mandate." There is no exception for persons who may potentially have a claim for damages against a governmental agency. The Legislature made both legal proceedings and mandamus available to all aggrieved members of the public "with the object of securing a decision as to these matters at the earliest possible time." (§ 6258.) It is not the prerogative of the courts to insist that petitioner employ one type of remedy over another where the Legislature has expressly made both equally available.

This leads to our second difficulty with the court's ruling. Assuming that section 6258 mandamus is not available where an alternative legal remedy exists which is plain, speedy, and adequate, the remedy identified by MTA is none of those things. Putting aside for the moment the time, effort, and financial resources required to institute a lawsuit against a governmental entity and to promulgate discovery requests, discovery is limited to matters "relevant to the subject matter involved in the pending action" which are themselves "admissible in evidence" or "appear[] reasonably calculated to lead to the discovery of admissible evidence." (Code Civ. Proc., § 2017, subd. (a).) A CPRA request can cover anything the person making the request suspects the agency might have in its files. As a member of the public, petitioner is entitled to the broader categories of documents available under the CPRA.

Moreover, at the time of petitioner's requests, it could not be conclusively presumed that she would file a government claim or institute a lawsuit.[3] It may well have been the case that the documents were requested to ascertain whether grounds for such a claim or lawsuit existed.

This conclusion is supported by the Supreme Court decisions discussing the legislative purpose and constitutionality of section 6259, subdivision (c), which gives litigants the right to immediate review of trial court orders by way of writ proceedings. In *Powers* v. *City of Richmond* (1995) 10 Cal.4th 85 [40 Cal.Rptr.2d 839, 893 P.2d 1160], the court explained: "[T]he statutory provision at issue in the present case—Government Code section 6259, subdivision (c) (hereafter section 6259(c))—was enacted in 1984 in response to problems encountered in direct appeals in cases arising under the Public Records Act. The principal proponent of the legislation, the California Newspaper Publishers' Association—which represented numerous news organizations that frequently relied upon the Public Records Act to obtain information concerning the actions of governmental entities and public officials—maintained that, in practice, the ordinary process of direct appeal was operating in cases under the Public Records Act to frustrate the significant public purposes underlying the act. In this regard, the association

---

[3]We see from MTA's opposition that petitioner filed a complaint on June 29, 1998, six months after petitioner's first request for documents under the CPRA.

pointed out that, even when a newspaper or other plaintiff that had brought an action under the Public Records Act prevailed at the trial court level and obtained a judgment compelling disclosure of particular records, a defendant public agency or public official routinely could delay disclosure of the records in question for a considerable period of time (often years) simply by filing an appeal of the adverse judgment, thereby preventing disclosure of public information at a time when the material still was newsworthy or of particular importance to the plaintiff. [¶] Persuaded that the *timeliness* of disclosure often is of crucial importance in actions brought under the Public Records Act, the Legislature responded by enacting section 6259(c). ▌ As amended in 1990, that statute provides that a trial court order made under the Public Records Act—either directing disclosure of a public record or supporting the decision of a public official refusing disclosure—is not subject to ordinary direct appeal but instead is 'immediately reviewable' by petition for an extraordinary writ to the Court of Appeal. [¶] As this legislative background demonstrates, it is clear that section 6259(c) was enacted not to diminish the rights of individuals, such as plaintiffs in this case, who seek disclosure of governmental information under the Public Records Act, but, on the contrary, for the general purpose of enhancing such persons' rights by ensuring that appellate review of trial court decisions under the act is conducted in a manner that promotes, rather than frustrates, the purpose of the act." (*Powers* v. *City of Richmond, supra,* 10 Cal.4th at pp. 117-118, citing *Times Mirror Co.* v. *Superior Court* (1991) 53 Cal.3d 1325, 1332-1335 [283 Cal.Rptr. 893, 813 P.2d 240], fn. omitted.)

▌ The legislative purpose of expediency and immediate reviewability, recognized by the Supreme Court in *Powers*, cannot be served by transforming a public record request into a drawn out discovery battle.

We are mindful of the trial court's belief that petitioner and her counsel are attempting to circumvent ordinary litigation protections and procedures, and its concern that if potential claimants are allowed to pursue documents under the CPRA, they will possess an unfair advantage over public agencies attempting to defend themselves. The CPRA contains numerous exemptions which would discourage improper CPRA requests of the type suspected here. (See, e.g., §§ 6254, subds. (b), (c), & (k), 6255.) The trial court's role is to review the agency's objections to the CPRA requests in light of the relevant exemptions.

▌ An appellate court's role in the CPRA process is to "conduct an independent review of the trial court's ruling; factual findings made by the trial court will be upheld if based on substantial evidence. [Citation.]" (*Times Mirror Co.* v. *Superior Court, supra,* 53 Cal.3d at p. 1336.) Here, the trial

court dismissed the matter and no factual findings were made concerning the documents, such as whether they are work product or covered by privilege or protected by the employee's right to privacy. We must therefore remand with instructions to conduct further proceedings in accordance with this opinion.[4]

## DISPOSITION

The alternative writ, having served its purpose, is discharged. Let a peremptory writ of mandate issue compelling respondent court to set aside its order of May 5, 1998, which dismissed the petition on the ground that there is an adequate remedy at law available to petitioner, and to reconsider the petition in conformity with the views expressed herein. Petitioner's request for attorney fees is denied. Each party is to bear its own costs.

Vogel (C. S.), P. J., and Epstein, J., concurred.

---

[4]Petitioner requests attorney fees pursuant to section 6259, subdivision (d), which provides: "The court shall award court costs and reasonable attorney fees to the plaintiff should the plaintiff prevail in litigation filed pursuant to this section. The costs and fees shall be paid by the public agency of which the public official is a member or employee and shall not become a personal liability of the public official. If the court finds that the plaintiff's case is clearly frivolous, it shall award court costs and reasonable attorney fees to the public agency." A decision on whether petitioner is entitled to attorney fees must await the trial court's ruling on MTA's claims of exemption.